IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MAGISTRATE NO. *1:19-mj-45*
[UNDER SEAL]

## APPLICATION AND AFFIDAVIT FOR A SEARCH AND SEIZURE WARRANT

I, Michael Thoreson, being duly sworn, do hereby depose and state:

1.  I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), United States Department of Justice in Erie, Pennsylvania. I have been an FBI Special Agent since February 2000. My assigned duties are centralized in the white-collar arena. These cases include bankruptcy fraud, bank fraud, health care fraud, money laundering, mortgage fraud, mail fraud, and wire fraud.

2.  This affidavit is submitted in support of an application for a search warrant for Lakeside Auto locations at 4844 Buffalo Road, Erie, Pennsylvania and 10215 West Main Street, North East, Pennsylvania. There is probable cause to believe that the items described in Attachment A, being evidence of violations of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1344 (Bank Fraud) will be found in the two locations to be searched.

3.  The information upon which this affidavit is based includes information obtained from witness interviews I have conducted, public records, and conversations with other law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

4. The property of 4844 Buffalo Road, Erie, Pennsylvania is described as a single story commercial building with adjacent vehicle sales lot. The name Lakeside Auto Sales is located on the outside of the building.

5. The property of 10215 West Main Street, North East, Pennsylvania is described as a single story commercial building with adjacent vehicle sales lot. The name Lakeside Chevrolet is located on the outside of the building.

## BACKGROUND

6. Public databases, business databases (Dunn & Bradstreet), and interviews conducted by your affiant all indicate that Andrew Gabler is the owner of the Lakeside Auto Group also known as Lakeside Auto Sales and Lakeside Auto. Gabler purchased the Lakeside Auto North East location in late 2013. The Lakeside Auto website states that Lakeside Auto sells vehicles at three locations in Northwest Pennsylvania. The website lists their locations as 4844 Buffalo Road, Erie, Pennsylvania and 808 East Main Street, Girard, Pennsylvania. Furthermore, the website lists the Lakeside Chevrolet (Lakeside Auto) site as 10215 East Main Street, North East, Pennsylvania. The website address for Lakeside is a typographical error, as the address listed for Lakeside Chevrolet is actually 10215 West Main Street, North East, Pennsylvania. As of June 5, 2019, the website for Lakeside Auto was still operating. However, none of the Lakeside Auto locations are actively selling vehicles.

7. In January 2019, after receiving reports of possible fraudulent activity concerning Lakeside Auto, your affiant contacted S&T Bank, which is based in Indiana, Pennsylvania. S&T Bank is insured by the Federal Deposit Insurance Corporation (FDIC). During your affiant's inquiry, S&T Bank reported possible fraud with Lakeside Auto. In late 2018, S&T Bank discovered Lakeside Auto was selling vehicles out of trust and providing misleading information

to S&T Bank. Lakeside Auto utilizes S&T Bank to provide the floor plan loan for Lakeside's vehicle inventory.

8. New automobile dealerships typically carry a large vehicle inventory in order to attract customers. Buyers can order vehicles or have vehicles specifically made for them. However, most customers want their vehicle sooner than the time it would typically take to manufacture a vehicle after it is specifically ordered. By having a large inventory, dealerships can offer customers different kinds of vehicles that may readily suit their customers immediate needs. The more vehicles a dealership has, the more likely a customer will find a vehicle they like. More customers leads to more sales and more money to the dealership. Not all dealerships can afford to outright purchase their inventory, especially those that have large inventories. As such, banks lend money to dealerships that can then be used to purchase the dealership's inventory. This is typically called a floor plan. The bank "floors" the vehicles by lending money to the dealership. Typically, a floor plan has a maximum loan amount and the dealership can draw on that loan as little or as much as they need. The bank requires interest payments, just like on a regular mortgage or credit card loan.

9. Banks utilize the dealerships inventory as collateral for the floor plan loan. Each vehicle on the lot is a piece of separate collateral. If the dealership were to go bankrupt, the bank could then collect the vehicles and sell them to satisfy the loan. In order to make sure the bank's collateral is accurately recorded, banks and dealerships enter into a contract whereby the bank will be promptly paid after a vehicle is sold. For example:

   a. Dealership A has a floor plan with a bank. Dealership A purchases vehicle #1 and uses money from the floor plan to purchase the vehicle. Dealership A then sells the vehicle to Customer B. Customer B pays for the vehicle via cash or through a bank loan. Either

way, the dealership receives money. Dealership A must immediately pay back the bank for vehicle #1 (the bank's collateral is now owned by an innocent customer). The difference between what was borrowed for vehicle #1 via the floor plan loan and the sales price is profit to the dealership. After the sale is completed, the dealership may want to replace vehicle #1, so the dealership purchases vehicle #2. Once again they draw on the floor plan and notify the flooring plan bank of their new purchase. The cycle then continues.

10. Bank floor plan contracts dictate when a floored vehicle is sold, the floor plan loan must be promptly paid. Banks may sometimes conduct audits of dealerships to verify their collateral is still on the dealership's lot. However, a known fraudulent dealership tactic is to sell vehicles that are floored, and not inform the flooring bank. The dealership then uses the money for other purposes. This is called "out of trust". The dealership is out of trust with their flooring plan bank by not immediately remitting funds on sold vehicles collateralized by the floor plan.

11. On January 23, 2019, your affiant conducted interviews with employees at the Lakeside Auto North East location and the Harborcreek (Erie) location. The Lakeside Auto controller advised that starting in or around September 2018, Lakeside Auto was involved in the selling of floored vehicles and not informing or paying S&T Bank (S&T Bank floored Lakeside Auto's vehicle inventory). Lakeside Auto was out of trust. Lakeside Auto owner, Andrew Gabler, knew about the sales and was involved in not revealing the sales to S&T Bank. The controller advised Lakeside Auto had unpaid bills. The controller claimed some of the money went to pay those unpaid Lakeside Auto bills. Lakeside Auto continued to sell floored vehicles without informing S&T Bank. However, S&T Bank suddenly conducted a random audit at Lakeside Auto and discovered Lakeside Auto was out of trust. Gabler admitted to S&T Bank what had happened.

4

Gabler and S&T Bank then entered into an agreement by which Gabler would pay back the money owed to S&T Bank. The controller stated Gabler borrowed approximately $415,000 from S&T Bank for the out of trust vehicles.

12. Due to Lakeside Auto's actions, S&T Bank took possession of the vehicle titles from Lakeside Auto. Dealerships typically keep the vehicle titles as they need immediate access in case a customer wants to purchase a vehicle. If the dealership maintains possession of the titles, they would then be able to take the title and transfer it over to the customer. Your affiant has investigated similar cases where dealerships were out of trust. Banks hope that by taking possession of the titles, the dealership will be unable to commit additional fraud. The bank is trying to prevent more collateral from disappearing. By keeping the titles, the dealership must contact the bank for the title. The bank then immediately knows their collateral has been sold and will demand immediate payment.

13. Further, during the January 23, 2019 interview, the Lakeside Auto controller revealed that in or around November 2018, Lakeside Auto once again began selling floored vehicles without paying S&T Bank. However, this time Lakeside Auto needed the title from S&T Bank, so they told S&T Bank about the sale in order to get the title. Lakeside Auto then would falsely inform S&T Bank that Lakeside Auto had not yet received money from the customer's bank. The controller told your affiant that Gabler knew about the fabricated story and approved of the falsehoods being conveyed to S&T Bank. Days and then weeks went by. Lakeside Auto continued to sell S&T floored vehicles, while also continuing to falsely convey to S&T Bank that the customer had not provided payment. For each new vehicle sale, Lakeside Auto conveyed the same false information. S&T Bank had no idea what was happening.

14. Sometime in late 2018, an S&T Bank employee telephoned the Lakeside Auto controller and told her that S&T Bank knows bank funding on an auto purchase and accompanying loan does not take more than twenty days. The controller advised your affiant that she then decided, on her own, to contact S&T Bank and tell them the truth about what was actually happening at Lakeside Auto. Shortly thereafter, the Lakeside Auto controller telephonically contacted Gabler and told Gabler that she was going to tell S&T Bank the truth about the out of trust vehicles. Gabler only said "I understand". The controller ultimately told S&T Bank the truth.

15. Lakeside Auto was out of trust, owing S&T Bank over $1,100,000. Lakeside Auto North East location sold 34 new and used vehicles out of trust, totaling over $1,104,000. The Lakeside Auto Girard location sold three used vehicles out of trust, totaling more than $32,000. Lakeside Auto kept over $1,100,000 from the sales of S&T Bank floored vehicles without informing S&T Bank that the vehicles had been sold.

16. On January 23, 2019, your affiant spoke with employees of the Hillyer Group. The Hillyer Group was ordered by Erie County, Pennsylvania Court of Common Pleas Judge Daniel Brabender to take over the finances of Lakeside Auto and determine the best course of action to liquidate Lakeside Auto's assets. The Hillyer Group would then use the sold assets to pay Lakeside Auto's creditors, including S&T Bank. The Hillyer Group has calculated there will be losses to S&T Bank, but the final loss figure will not be known until everything is sold. The Hillyer Goup advised your affiant that once they were ordered to take over Lakeside Auto, they met with Gabler and spoke with him for over three hours. During their conversation, they questioned Gabler as to what happened with the money from the sales of S&T Bank's floored vehicles. Gabler did not provide answers and was not forthcoming with details and explanations. Hillyer Group thought this was very odd because Gabler was the owner of Lakeside Auto. As the Hillyer Group's

conversation continued with Gabler, he was never forthcoming. Furthermore, during their conversation, Gabler advised he had no knowledge that Lakeside Auto was out of trust with S&T Bank. Gabler claimed he was completely unaware that his own business had kept the funds from sold S&T Bank floored vehicles.

17. When your affiant interviewed the Lakeside Auto controller in January 2019, the controller indicated that Andrew Gabler and the Lakeside General Manager were both fully aware of being out of trust with S&T Bank on both occasions when it happened.

18. In January 2019, the Hillyer Group disclosed that they were attempting to liquidate Lakeside Auto as soon as possible. The Hillyer Group was aware of the FBI investigation and was fully on board with steps that needed to be taken pursuant to the investigation. Most recently, on June 5, 2019, Mark Uhrich, from the Hillyer Group, again authorized the FBI to take any records from Lakeside Auto, both physical or electronic, that the FBI needed.

19. On January 29, 2019, United States Magistrate Judge Richard Lanzillo signed a search warrant for four separate Lakeside Auto locations to include 4844 Buffalo Road, Erie, Pennsylvania and 10215 West Main Street, North East, Pennsylvania. Agents of the FBI executed the warrants and took possession of sales files on January 30, 2019. The FBI kept some files and returned the rest to the Hillyer Group. The FBI only kept sales files that involved extended warranties. All other files were returned. As of June 5, 2019, the new vehicle sales files were stored at 10215 West Main Street, North East, Pennsylvania.

20. In May and June 2019, your affiant conducted interviews with several former Lakeside Auto employees. During the interviews, employees told your affiant that they and other employees produced fake buyer's orders. Two Lakeside Auto employees both stated Andrew Gabler ordered them to change dates on buyer's orders and then print the new buyer's orders.

Gabler or the Lakeside Auto controller took possession of the fake buyer's orders. Neither employee could recall exactly how many they changed nor the dates of the changes. Both employees left Lakeside Auto prior to October 2019. One of the employees advised that he/she changed buyer's orders for just dealer trades. Dealer trades are defined as follows: Vehicle dealers can trade or sell vehicles to each other. Typically, when they enter into an agreement to trade, dealers will take possession of a vehicle and have a check ready upon pickup for the other dealer. A buyer's order will be produced showing the sale to the other dealer. A vehicle sales file is created and the buyer's order is then placed into that file and stored. The buyer's order is proof of the sale.

21. Around the same time the buyer's orders were changed, bank auditors were visiting Lakeside Auto. S&T Bank auditors typically verified that vehicles were still at Lakeside Auto whenever they conducted an audit. S&T Bank floored the vehicles and wanted to confirm their collateral was still at the dealership. A Lakeside Auto employee advised he/she discovered that his/her new buyer's orders were being used to deceive the banks into thinking sales were more recent than actual. Each time Gabler ordered a buyer's order date to be changed, he ordered a date more recent than the actual sale. After having reprinted several fake buyer's orders, both employees eventually told Gabler they would no longer produce fake buyer's orders.

22. Since the January 30, 2019, execution of the Lakeside Auto search warrants, your affiant has reviewed S&T Bank documents obtained via a federal grand jury subpoena. Within the documents were S&T Bank audit reports for the 10215 West Main Street, North East, Pennsylvania Lakeside Auto location. Audits for January 10, February 15, and March 21, 2018 were among those included. The audit reports listed vehicle sale dates that Lakeside Auto provided to S&T Bank. For example, VIN 1GNEVGKW0JJ146645 was reported to have been sold by

Lakeside Auto on January 9, 2018. Lakeside Auto reported the vehicle was sold to Laria Chevrolet. When S&T Bank searched the lot on January 10, 2018, for VIN 1GNEVGKW0JJ146645, they could not locate the vehicle because it had already been sold. At the time of the audit on January 10, 2018, Lakeside Auto had not paid the floored amount owed for VIN 1GNEVGKW0JJ146645. However, with a reported sale date of January 9, 2018, Lakeside Auto was not considered delinquent according to their contract with S&T Bank (payment must be made within 10 days upon sale).

23. Your affiant also reviewed bank statements for Lakeside Auto. The statements were received from First National Bank pursuant to a federal grand jury subpoena. Contained in the statements were copies of checks and deposits for Lakeside Auto transactions. Your affiant noted that on January 4, 2018, Lakeside deposited a $36,277 check from Laria Chevrolet. Within the memo portion of the check was VIN 1GNEVGKW0JJ146645.

24. General Motors documentation reviewed by your affiant has revealed that Laria Chevrolet had sold the above noted vehicle to a Laria customer on January 2, 2018. However, Lakeside Auto told the S&T auditors they sold the vehicle to Laria on January 9, 2018, seven days after Laria Chevrolet had already sold the vehicle.

25. Your affiant also identified additional Lakeside Auto reported sales dates that differed from non-Lakeside Auto records. For example, for VIN 1GNEVHKW7JJ179213, S&T Bank reported they were informed by Lakeside Auto the vehicle was sold by Lakeside Auto to a dealership on March 16, 2018. However, General Motors documents reported the vehicle was originally owned by Lakeside Auto and then sold by a Michigan dealership on February 23, 2018. Another example was VIN 3GNAXHEV8JL130641 for which a sales date to Paddock Chevrolet of February 13, 2018 was reported to S&T Bank. However, documents show the vehicle was sold

by Paddock Chevrolet on January 31, 2018. For each of the above noted transactions, S&T Bank's floor was not paid at the time of the audits. Comparing the audit dates to the sale dates reported by Lakeside Auto, Lakeside Auto was not delinquent. However, using the actual sale dates, the floor loans would have been delinquent.

26. In summary, two different former Lakeside Auto employees stated they were ordered by Andrew Gabler to change buyer's orders to make the sales look more recent. Records from both Lakeside Auto bank accounts and General Motors revealed dates that were not consistent with sale dates reported by Lakeside Auto to S&T Bank. Information collected since the January 30, 2019 search warrants has revealed that Lakeside Auto was selling out of trust going back farther than originally known. In order to determine those sales that were fraudulently changed, the FBI needs to re-examine the sales files. The FBI was unaware at the time of the prior search warrants that Lakeside Auto employees were producing fake buyer's orders, as such, the FBI was unable to look for something it did not know about. Only by searching through thousands of documents and conducting numerous interviews was the FBI able to uncover the false buyer's order scheme. The buyer's order scheme is different from the focus of the previous search warrants in January 30, 2019. Those search warrants focused on allegations of extended warranty non-payment along with selling out of trust in the later part of 2018. As mentioned above, both former Lakeside Auto employees advised they left prior to October 2018, thereby illustrating the selling out of trust scheme went on longer than originally believed.

27. A federal search warrant is being requested for sales files both electronic and non-electronic. Lakeside Auto utilized a computer system called Reynolds and Reynolds to record and document sales. The buyer's orders were produced using that system. Only one remaining Lakeside Auto employee has access to this system. The Hillyer Group retained that employee to

assist in the closing of Lakeside Auto. That employee currently works at the 4844 Buffalo Road location, while most if not all of the sales files are at the 10215 West Main Street, North East location.

## **COMPUTERS**

28. This application seeks permission to search and seize records that might be found at 4844 Buffalo Road, Erie, Pennsylvania; and 10215 West Main Street, North East, Pennsylvania, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive or other electronic storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

29. I submit that if a computer or other electronic storage medium is found on the premises and the current ubiquity of home computers, laptop computers and cell phones, there is probable cause to believe those records based on my knowledge, training, and experience, will be stored in that computer or storage medium, for at least the following reasons:

   a. Such computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

11

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media, in particular, a computers' internal hard drives, contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.  This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

f. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, email, and financial transaction files), computer storage media can contain other forms of electronic evidence as well:

i) Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is called for by this warrant to determine any party's role in perpetrating this fraud scheme. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

ii) Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant

13

messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

    iii)    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

    iv)    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment A also falls within the scope of the warrant.

30. Searching storage media for the evidence described in the attachment may require a range of data analysis techniques. It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant. In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, it is possible, though rare, for a storage medium

to be organized in a way where the locations of all things called for by the warrant are immediately apparent. In most cases, however, such techniques may not yield the evidence described in the warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for not only records or data concerning the alleged fraudulent scheme but also records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

31. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

32. In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or

all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

## CONCLUSION

33. For all the reasons described above, there is probable cause to believe that evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1344 (Bank Fraud), will be found in a search of 4844 Buffalo Road, Erie, Pennsylvania and 10215 West Main Street, North East, Pennsylvania. Your affiant respectfully requests the Court to issue a search warrant for items listed in Attachment A.

34. The foregoing is true and correct to the best of my knowledge, information, and belief.

Special Agent
Michael Thoreson
Federal Bureau of Investigation

Subscribed and sworn to before me
this 11th day of June, 2019.

Richard A. Lanzillo
United States Magistrate Judge